O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 24P, LLC, | ) | Case No. CV 08-07935 DDP (RCx) |
| Plaintiff, | ) | |
| | ) | **ORDER GRANTING MOTION TO COMPEL** |
| v. | ) | **ARBITRATION** |
| | ) | |
| PRZYBORSKI PRODUCTIONS, INC., and KEYSTONE COMPUTER RESOURCES, INC., | ) ) ) | [Motion filed on January 30, 2009] |
| Defendants. | ) | |

**I.   BACKGROUND**

This case involves a dispute over patent royalty payments, and an alleged settlement agreement where the parties agreed to divide those royalties.  The patents in this case deal with the image quality produced by video recorders.  Plaintiff 24P owns a patent which allows a video recorder to record images in a manner which simulates the appearance of film. (Compl. ¶ 8.)  Defendants Przyborski Productions and Keystone Computer Resources manage a different patent which adds the quality of film "grain" to video recordings.  (Compl. ¶ 10.)  The current dispute between the

parties and the subject of Defendants' instant motion is whether they agreed to arbitrate their current dispute.

On November 7, 2005, the parties entered a License Agreement where Plaintiff agreed to pay Defendants 40% of royalty payments resulting from sales of their "pooled" patents, while reserving 60% to itself (a 60/40 split). (Compl. ¶ 17 Ex. A. ¶ 5.1.) However, in the event that Plaintiff brought suit against a third-party for infringement of patents at its own expense and the parties settled, then Plaintiff agreed to pay Defendants 30% (a 70/30 split) of any settlement royalty payment. If Defendants' patents were not at issue in a settlement, Plaintiff agreed to pay Defendants 10% (a 90/10 split) of settlement royalties. (Compl. ¶ 17 Ex. A ¶ 12.3.)

Before this License Agreement was negotiated and signed, in the spring of 2005, Plaintiff entered discussions with a large electronics manufacturer ("Electronics Manufacturer") regarding a license of the parties' patent pool. (Schermer Decl. ¶ 6.) These discussions eventually fell through, and Plaintiff informed Defendants that it intended to sue the Electronics Manufacturer (Compl. ¶ 20); and that it wanted Defendants to sign the above License Agreement before proceeding with the suit. (Schermer Decl. Ex. 5.) In requesting that Defendants sign the License Agreement in anticipation of the lawsuit, Plaintiff allegedly stated that Defendants would receive 40% (i.e., not 30% or 10%) "in connection with [the Electronics Manufacturer]". (Schermer Decl. ¶ 8 Ex. 2.) Defendants then signed the License Agreement, with the terms as described above (i.e., with options other than only a 60/40 split). Defendants did not participate in the suit against the Electronics Manufacturer. (Schermer Decl. ¶ 17, 26.)

1    Plaintiff then reached a tentative settlement agreement with
2 the Electronics Manufacturer (the "Manufacturer Settlement"), and
3 asked Defendants to execute various agreements in connection with
4 the Settlement under a 70/30 split.  (Schermer Decl. Ex. 3.)
5 Defendants refused to sign the supporting agreements under a 70/30
6 split, and argued that they were entitled to a 60/40 split,
7 pursuant to Plaintiff's correspondence.  (Schermer Decl. Ex. 5.)
8 At this point, on April 5, 2006, Plaintiff offered to split the
9 proceeds from Manufacturer Settlement under either:

> 1) a 70/30 split, with no termination of the License Agreement; or
> 2) a 60/30 split with "the remaining 10% being escrowed and arbitrated," and termination of the License Agreement as to all future license deals.

14 (Schermer Decl. Ex. 6.)  On April 6, 2006, Defendants sent
15 Plaintiff an email that "proposed" that Defendants would sign
16 documents supporting the Manufacturer Settlement, the parties would
17 split the Settlement 60/30, and that the remaining 10% would "get[]
18 put into a bank account as an escrow" - pursuant to an arbitration
19 and escrow agreement, which Defendants stated that the parties
20 "will enter."  (Schermer Decl. Ex. 7.)  Defendants then proposed
21 approximately five paragraphs of terms relating to the parties'
22 arbitration agreement.  (Id.)
23    There is no further correspondence from the parties indicating
24 acceptance of Defendants' proposed escrow and arbitration terms.
25 Nevertheless, Defendants then executed the documentation required
26 to support the Manufacturer Settlement, Plaintiff finalized the
27 Manufacturer Settlement, Plaintiff paid Defendant 30% of the
28 proceeds, and Plaintiff terminated the License Agreement.  However,

3

as represented by Plaintiff at oral argument, Plaintiff actually paid itself 70% and apparently did not put any funds into escrow (even though Defendants allege that Plaintiff's counsel represented to them that the 10% had been deposited in a bank account pending resolution of the dispute).

Approximately one year later, on December 18, 2007, the parties still did not have a signed arbitration agreement, but had agreed that the amount at issue regarding the disputed 10% totaled $458,220.20. (Schermer Decl. Ex. 15.) The parties continued to negotiate arbitration terms until November 2008. On November 11, 2008, Defendants sent Plaintiff's counsel an email stating: "Please send us your client's final position by November 15; if we do not hear from you by then, we will move forward with the litigation."[1] (Gelfound Decl. Ex. 10.) Plaintiff did not respond to this email, and instead filed suit in this Court on December 2, 2008. Accordingly, there has never been a signed arbitration agreement between the parties.

Currently, Plaintiff argues that it agreed to a 60/30 split (with immediate termination of the License Agreement), while separating and putting aside the question of whether to arbitrate the remaining 10%.[2] Defendants argue that the parties agreed to a

---

[1] On May 4, 2008, Defendants filed a "Praecipe for Writ of Summons" in Pennsylvania state court against Plaintiff, Robert Faber (the creator of Plaintiff's patent), and non-party Filmlook, Inc. (another company created by Faber). (Gelfound Decl. Ex. 5.) Although a praecipe is not an actual complaint, it "commences" the litigation and forestalls the statute of limitations, as long as it is served on the defendant (as it was here). Johnson v. Allgeier 852 A.2d 1235 (PA Super. Ct. 2004).

[2] Plaintiff also argues that it erroneously paid 30% to Defendants, when it was only legally required to pay them 10% under
(continued...)

4

60/30 split (with immediate termination of the License Agreement) and to arbitrate the remaining 10%.

Defendants now move to compel arbitration under the agreement as represented by the parties' correspondence.

**II.  LEGAL STANDARD**

Arbitration can only be compelled where there is a contract between the parties agreeing to this term. Chiron Corp. v. Ortho Diagnostic Sys., 207 F.3d 1126, 1130 (9th Cir. 2000)("An agreement to arbitrate is a matter of contract: 'it is a way to resolve those disputes - but only those disputes - that the parties have agreed to submit to arbitration.'") (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995)).  Where the parties have validly agreed to arbitrate, the Federal Arbitration Act ("FAA") requires a district court to direct the parties to "'proceed to arbitration on those issues as to which an arbitration agreement has been signed.'"  Id. (quoting Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1985); 9 U.S.C. §§ 2, 4.

Therefore, under the FAA the court may only determine: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  Id.

**III. DISCUSSION**

In evaluating whether an arbitration agreement is valid, federal courts "should apply ordinary state-law principles that govern the formation of contracts." Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1170 (9th Cir. 2003)(quotation omitted). Neither side discusses whether California or another state's law

---

[2](...continued)
the License Agreement.  (Compl. ¶ 22.)

should apply to the Court's analysis.  However, as the parties appear to have agreed that California law would have applied to any arbitration (see Schermer Decl. Ex. 18), the Court will apply California law.

Contract formation requires "mutual consent" to the "same thing in the same sense" by the parties to a contract. Weddington Prods. v. Flick, 60 Cal. App. 4th 793, 811 (Cal. Ct. App. 1998)(citations omitted).  Mutual consent is determined by "what the outward manifestations of consent would lead a reasonable person to believe." Meyer v. Benko, 55 Cal. App. 3d 937, 942-943 (Cal. Ct. App. 1976).  Additionally, a proposal must be "sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain." Weddington Prods., 60 Cal. App. 4th at 811; see also Cal. Civ. Code § 3390(5)(contracts must be "sufficiently certain to make the precise act which is to be done clearly ascertainable").

Defendants argue that the contract between the parties is established by their written correspondence and their performance, while Plaintiff essentially argues that these merely reflect the terms agreed to under the License Agreement.  For the reasons stated below, the Court agrees with Defendants.

On April 5, 2006, Plaintiff sent Defendants an email offering to split the Manufacturer Settlement proceeds either 60/30 with arbitration, with termination of the License Agreement, or 70/30 without arbitration, and no termination of the License Agreement. (Schermer Decl. Ex. 6.)  On April 6, 2006, in response, Defendants only expressly "proposed" two identical terms - the 60/30 split and to sign the documents supporting the Manufacturer's settlement.

6

1  (See Schermer Decl. Ex. 7 ("[Plaintiff] will disburse to itself 60%
2  of the net figure . . . [Defendants] will receive 30% of that sum
3  at the exact same time . . . .")  Defendants also made a
4  counteroffer regarding the disputed 10%, and proposed that
5  Plaintiff would put the 10% in escrow contingent on various terms,
6  including arbitration of its dispensation.  Specifically, these
7  terms included:

> 1) that the parties would enter both an escrow and arbitration agreement;
> 2) that an American Arbitration Association ("AAA") arbitrator would be selected, that the arbitrator would be paid from the disputed 10%, and that the parties' briefing would be limited in particular ways;
> 3) the issues the arbitrator would decide;
> 4) the remedies available to the parties; and
> 5) deadlines for the completion of the escrow and arbitration agreement.

(Schermer Decl. Ex. 7.)  Defendants also expressly gave Plaintiff the option to terminate (but did not choose to terminate the License Agreement themselves).  In addition, there were three items of consideration supporting this proposal: (1) settlement of the disputed claim regarding the Manufacturer's Settlement, (2) that Plaintiff would pay Defendants 30% of the proceeds and limit its own proceeds to 60%, and (3) that Defendants would sign documents supporting the Manufacturer Settlement.  Therefore, although phrased as a "proposal," the Court finds, for the purposes of this motion only, that the parties agreed to a 60/30 split.  The Court also finds, for the purposes of this motion, that Defendants made a counteroffer regarding escrow and arbitration as to the remaining 10%.

7

Contrary to Plaintiff's arguments, the Court also finds (for this motion only) that Defendants' acceptance of Plaintiff's offer of a 60/30 split is an independent contract from the License Agreement.  This second agreement, which essentially constitutes a settlement agreement of the parties' differences, materially differed from the License Agreement in that it contains distinct terms and was supported by separate consideration.  See <u>Weddington Prods.</u>, 60 Cal. App. 4th at 810-11 ("A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts.")  While the subject of the License Agreement was the exchange of Defendants' patents for royalty payments, here the parties entered an agreement to settle a disputed claim.  See 1 Witkin, Summary of Cal. Law, Contracts, § 211 (10th ed. 2005)("Consideration may be forbearance to sue on a claim, extension of time, or any other giving up of a legal right, in consideration of some promise.").

Furthermore, the Court finds for the purposes of this motion that Plaintiff accepted Defendants' counter-proposal to arbitrate by accepting Defendants' consideration.  See <u>Sully-Miller Contractor Co. v. Gledson/Cashman Constr.</u>, 103 Cal. App. 4th 30, 36 (Cal. Ct. App. 2002)(finding that the promises to settle "were revocable until accepted by the tender of payment").  In other words, Defendants performed by signing the documents required for the Manufacturer Settlement, and Plaintiff performed by paying Defendants 30%.  Plaintiff also performed by terminating the License Agreement.  See Cal. Civ. Code § 1584 ("Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal."); Cal.

8

Civ. Code § 1589 ("A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting.").

It is true that the parties continued to negotiate after their initial settlement agreement, but these negotiations regarding the terms of the arbitration agreement reflect modifications to the pre-existing settlement agreement between them. This reasoning is supported by the subsequent negotiations between the parties, which did not alter the fundamental issues (arbitration and the subject of arbitration), and as late as December 18, 2007 showed agreement as to the amount at issue for arbitration ($458,220.20). (Schermer Decl. Ex. 15.)

Plaintiff argues that the correspondence between the parties merely reflects ongoing negotiations, and that there were not sufficient terms to reasonably find an agreement to arbitrate. In particular, Plaintiff states that the parties could not agree on whether to include Faber's company Filmlook as a party in the arbitration. But these arguments reference negotiations that occurred after the parties' agreement to arbitrate the disposition of the final 10% of the Manufacturer Settlement, which the Court finds were sufficiently detailed. (See Schermer Decl. Ex. 7.)

Plaintiff also argues that Defendants' conduct is inconsistent with an agreement to arbitrate. Specifically, as noted above, Plaintiff argues that Defendants initiated a lawsuit in Pennsylvania in 2008 by filing a Writ of Summons, as well as sent various emails to Plaintiff stating that they had reached an "impasse" with regard to arbitration settlement negotiations and

9

instead intended to "litigate." (Opp'n 3-5.) For example, on November 11, 2008, Defendants sent an email to Plaintiff stating: "Please send us your client's final position by November 15; if we do not hear from you by then, we will move forward with the litigation." (Gelfound Decl. Ex. 10.) While Defendants' actions do suggest that they were considering litigation, this Court finds that these communications amount to a demand for performance of arbitration agreement. The suit filed in Pennsylvania is similarly not a repudiation of the arbitration agreement between the parties, because Defendants never actually sought to litigate the merits of the dispute.

Therefore, the Court finds that the parties validly agreed to arbitrate their dispute, and that the agreement encompasses the dispute at issue - the dispensation of the final 10% of the Manufacturer Settlement.

**IV. CONCLUSION**

The Court GRANTS the motion to compel arbitration, and ORDERS the parties to choose an arbitrator and submit to binding arbitration in Los Angeles within 60 days.

IT IS SO ORDERED.

Dated: June 11, 2009

DEAN D. PREGERSON
United States District Judge